THE STATE OF ALABAMA VS M'DONALD.

*Points upon the statute of* 1812,* *on the subject of aid-*
*ing a rebellion of slaves.*

1. The act of 1812, upon the subject of abetting the rebellion of
slaves, embraces four distinct descriptions of offence,—

First—For a free person to be aiding and assisting, or in
any wise concerned with, a slave or slaves, in any actual re-
bellion or conspiracy.

Secondly—for a free person to be similarly concerned in
any meditated rebellion or conspiracy.

Thirdly—For any free person, in any manner, to advise, plot
or consult with any slave or slaves, for the purpose of encour-
aging, exciting, aiding or assisting any such insurrection or
rebellion.

Fourthly—For any free person, in any manner, to advise,
plot, or consult with any slave or slaves, for the purpose of en-
couraging, exciting, aiding or assisting an intended insurrec-
tion or rebellion.

2. Each of the foregoing classes embraces several offences—as,
in the first class, "aiding and assisting a slave or slaves," &c.
is one offence; to be, "in any wise, concerned with a slave or
slaves," &c. is another; and so each category is susceptible
of sub-division.

3. To render one guilty of the offence of *"aiding and assisting,"*
&c. a slave or slaves, in a meditated rebellion or conspiracy,
it would not be essential that a rebellion or conspiracy should
be *first* meditated by a slave:—if a free person and a slave are
concerned, it is immaterial, with whom the scheme may have
originated.

4. But to make a *free person* guilty of *advising, plotting* or *con-*
*sulting* with a slave or slaves, for the purpose of *encouraging*
*any insurrection or rebellion* under that act, there must be proof
of an actual or meditated rebellion, by a slave or slaves.

Aikin's Digest p. 108, §44.

5. Any words or acts of a free person, which manifest a design to effect an insurrection or rebellion, if employed with a view to such result, would, it seems, be sufficient to authorise a conviction for advising &c. an intended insurrection, &c. without the intention originating with a slave, or his concurrence or assent being obtained.

6. And such intention need not be shewn by direct and positive proof, where inferible from facts and circumstances in themselves indicating it.

7. That advising, plotting or consulting, for the purpose of encouraging, exciting, aiding or assisting an insurrection or rebellion, make treason in other nations, which offence is recognized under a peculiar definition in the constitutions of the United States and of Alabama,—does not preclude the legislature from denouncing these acts as a distinct offence, punishable capitally.

8. The right of protection belongs to man in his natural state—It extends to political communities, and is the foundation of the moral power to punish crime, or provide against its commission. The right to punish an offence actually committed, includes the right to prevent, by imposing adequate sanctions.

The prisoner was indicted in the Circuit Court of Lowndes, in an indictment with four counts.

In the first and third it was charged that he " did maliciously, feloniously and traitorously advise, plot and consult with Moses, a slave belonging to one Jesse H. Robertson, for the purpose of encouraging, exciting and aiding an insurrection against the laws and government of the State of Alabama, &c."

In the second and fourth counts, the term "rebellion" was substituted for " insurrection."

The second concluded as the first; and the third and fourth charged the offence to have been committed " against the people," instead of " against the laws and government."

The prisoner plead not guilty, and the case went to the jury. On the trial, the presiding Judge reserved many points, which, after judgment, he referred to this Court for decision, as novel and difficult. So many of them as are material to be considered, may be stated from the record as follows:

" The State's counsel introduced witnesses, who gave evidence, that the master of the slave Moses, in consequence of suspicions entertained by him, directed the slave Moses, that if the prisoner should come to him, that he should conduct him to a particular spot, and there hold the conversation with him. That in consequence of this the negro did conduct the defendant to that spot, and held the conversation with the defendant, which was detailed in evidence, in the hearing of his master and another, and with the knowledge that they were so concealed, and for the purpose of detecting the defendant. In this conversation the defendant said the negroes ought to rise, and if they would he would head them ;—that they had hard masters. That they must raise five hundred men, but he would start with three hundred men. That a negro in the neighborhood, named Frank, was to furnish him with a horse. The defendant promised to give the rifle he had with him to Moses, when they started : he shewed him how to cock it, and snapped it two or three times. The defendant told the slave Moses, that they would go to Mobile, and that if they did not like that, they would then go to Pensacola—that, that was a weaker place. That they could get arms and ammunition there, and could press a ship, with which they could go to Texas. That Texas was a free place, and that they

might have their freedom there. That they would be joined by other slaves on their way to Mobile. The defendant urged the slave to go home with him, which the negro declined, but promised to come next evening to his house. The slave Moses, the next evening went, with his master and several gentlemen of the neighborhood, to the place of the defendant's residence. These gentlemen concealed themselves, and the slave was sent for the defendant, who was conducted to a spot near them, and there held a conversation with the slave. The slave acted under the direction of his master and others, and his questions to the defendant were prompted by instructions from them, and were for the purpose of discovering the defendant. The defendant then told the slave that he must get him one thousand men, but he would start with five hundred. That they would make a forced march to Pensacola, take that, press a ship, and sail to Texas. That it was not safe to stay in Florida, as the United States would reach them :— that he knew how to man a ship :—they could enjoy freedom in Texas. He stated they could get guns from their masters, with ammunition and horses, and escape to Pensacola, and that Moses should have his rifle. The defendant said there was no white men engaged—he would head them, and that Frank should be second in command, and Moses third in command."

"It was in evidence, that the defendant, the day before the first conversation herein stated, was at a retail store and drank freely of ardent spirits," &c. on the afternoon of the days of the conversations above detailed.

" The witnesses all stated they thought him sober during the time he was holding these conversations with the slave. The master of the slave stated, that the slave was faithful and obedient, and that the earliest information was received from him. That in all these conversations after the first information to the master, he was the instrument of his master, for the purpose of detecting the defendant.

" The witnesses all stated that there was no disturbance in the county among the slaves ;—that there was no insurrection or rebellion there; and that there was no evidence of any preparation on the part of the defendant, or any illegal conduct further than could be gathered from these conversations. They all denied any knowledge of any further tampering or advice or counsel, further than could be deduced from his conversations."

" The counsel for the defendant, asked the Court to charge the jury, that if they believed the conversations and plans of the defendant were not for the purpose of encouraging, exciting or aiding an existing rebellion or insurrection against the laws, government or people of the State of Alabama,—he ought not to be found guilty under this indictment :" which was refused by the Court, and the question reserved as novel and difficult, for the decision of this Court.

" The counsel for the prisoner asked the Court to charge the jury, if they believed that in the conversations detailed in evidence, between the slave Moses and the defendant, the slave had no participation in any illegal design, and did not advise, plot or consult, for the purpose stated in the indictment,

the prisoner ought not to be found guilty. This charge the Court refused to give; but charged the jury, that whatever the purposes of Moses might have been, if the defendant had the purpose of encouraging, exciting and aiding an insurrection or rebellion, although at the time contemplated by himself only against the government, people or laws of the State of Alabama, and communicated the same to Moses, with the view of securing his participation, then the defendant was guilty." The refusal to charge as requested, and the charge given, were reserved, and referred to this Court for its decision, as presenting questions of law, both novel and difficult.

This case was argued by *Campbell* for the prisoner; *The Attorney General*, contra.

COLLIER, J.—The first inquiry which invites our consideration, in examining this case, is this— What offence does the indictment charge?

For the prisoner, the sufficiency of the indictment has not been controverted; but it is insisted, that its allegations are such as to have inhibited his conviction upon the evidence which went to the jury against him. To test the correctness of this conclusion, reference must be had to the statute upon which the indictment is founded :—That statute is as follows : "If any free person shall be aiding and assisting, or in any wise concerned with any slave or slaves, in any actual or meditated rebellion or conspiracy against the laws, government or people of this territory, or shall in any manner advise, plot or consult with any slave or slaves, for the purpose of encourag-

ing, exciting, aiding or assisting any such insurrection or rebellion, or intended insurrection or rebellion, such free person so offending, and being thereof con- victed, shall suffer death."

The first branch of the act embraces two distinct descriptions of offence.

1st. For a free person to be aiding and assisting, or in any wise concerned with a slave or slaves, in any actual rebellion or conspiracy.

2d. For a free person to be similarly concerned in any meditated rebellion or conspiracy.

The second branch of the act, is alike comprehensive, and subjects to punishment—

1st. Any free person who shall in any manner advise, plot or consult with any slave or slaves, for the purpose of encouraging, exciting, aiding or assisting any such insurrection or rebellion.

2d. Any free person who shall in any manner advise, plot, &c. an intended insurrection or rebellion.

To make "a free person" guilty of the first offence prescribed by the first branch of the statute, it is necessary that there should be an "actual rebellion." To make out the second offence, it is necessary that the offence should not have developed itself by action. The term "meditated," connected with the word "actual," by the disjunctive conjunction *or*, must, from the relation in which it is found, be held to mean something not yet done—something in a state of incubation, yet to discover itself, something brooded over, and perhaps talked about; for if there was an entire silence it would be difficult to ascertain the feelings of the heart or the operations of the mind.   And thus considered, it must be held to limit

the substantives " rebellion or conspiracy" in its con-
nection, to a scheme *in fieri*, which by no *overt* act
has seen the light of day.   The rebellion or conspi-
racy supposed to be meditated, need not originate
with a *slave or slaves*—it may be prompted by a *free
person ;* but to make out the offence, it is necessary
that a *slave or slaves* should lend to it a favorable ear.
If the words *aiding and assisting* were alone employ-
ed, it would be necessary to shew that a *slave or
slaves* were the prompters or prime movers in a plan
for rebellion: for to aid and assist, always implies
that there is a principal to receive aid and assistance.
But the words "in any wise concerned with," are
used, and very clearly shew, that it is not necessary
that a " rebellion or conspiracy" should be first *me-
ditated* by a *slave*; it is enough for a *free person* and a
slave to be *in any manner concerned in it*, no matter
which may claim the *honor* of having originated it.

The terms "rebellion or insurrection," employed,
in the second branch of the act, are used as synoni-
mous; this is sufficiently indicated by the terms " any
such insurrection or rebellion,"—and are referible
as the words ".any such" prove, to the first branch of
the act.

To make a *free person* guilty of *advising, plotting or
consulting with any slave or slaves, for the purpose of
encouraging, &c. any insurrection or rebellion*, such as
the first branch of the act contemplates, it would be
necessary to shew that a *slave or slaves* have already
assumed a rebellious or insurrectionary attitude, or
else, that they *meditate* the assumption of such a po-
sition.

It has been already shewn what would constitute

a *meditated* rebellion, let us now inquire what is essential to an *actual rebellion or insurrection.* These terms, in their ordinary acceptation, mean a resistance to the established order of things.

However regardless one may be of the dictates of social duty, or reckless of civil order, so long as he locks up, in his own breast, his unpatriotic and wicked feelings, or merely gives vent to them by words, he rebels not against the laws and government of his country. But, when, having indulged these sentiments, for a period sufficiently long to prepare him for active movements, setting at defiance the duties of the man and the citizen, he places himself in hostile array to the quiet and security which society professes to guarantee to its members—he is then, and not sooner, in a state of rebellion to the *laws, government or people of the State.*

In regard to the second offence, denounced by the second branch of the statute, it may be remarked, that a mere intention, undiscovered by any thing said or done, or shewn merely by loose and casual remarks, would not prove an *intended rebellion.* The *intention,* being the chief constituent of the offence, must be proved by some developement of less equivocal import. And, in ascertaining what evidence shall be held to indicate the intention, we know of no source, to which we can more appropriately resort, for information, than to the decisions which have been made upon the statute 25 Edw. III. (ch. 2,) which makes its treason to compass or imagine the death of the king and other members of the royal family.

In Kel. 17, and Fost. 196, it is held, that if divers persons meet and consult how to kill the king, this

4P.              58

is, in every one of them, an overt act of compassing or imagining his death, although no method of killing him be agreed upon. So, in 1 Hawk. ch. 20, and in H. P. C. 127, it is said, that a knowledge of a design to destroy the king, if accompanied with any circumstance of assent or approbation, is an overt act of compassing or imagining his death. And in the case of the regicides,* it was decided that if a man accidentally present at a meeting, holden to consult the destruction of the king, go a second time to such a meeting, this is evidence of his assent to, or approbation of the traitorous design. See also, 1 Hawk. ch. 17—Kel. 22–23—Fost. 200.

*Kel. 17,21

These authorities very fully maintain, that acts or words, which manifest a design upon the king's life, or are calculated to excite, in others, such a design, are proof of compassing or imagining his death. These and similar developements, when directed to that end, we should consider as indicating an " intended insurrection."

It has been already remarked, in reference to the offence we are considering, that the *intention* is the essence of it; but the statute no where (even by a just interpretation,) requires that the intention should originate with *a slave or slaves*, or that he or they should even intend *a rebellion or insurrection.* If a *free person* shall *in any manner advise, &c. with any slave or slaves, for the purpose of encouraging, &c. a rebellion or insurrection intended by him only,* he is guilty of this offence, though the arguments addressed to the slave may not have been such as to command his approbation.

To *intend*, must be understood to mean the same,

with *design* or *contemplate*. A *free person* need not intend unconditionally—the intention is well made out, when it appears that he designed an insurrection or rebellion, if he could exert a sufficient influence over the slaves, to arouse them to action, and that he employed arguments, or used other means, to effect that result.

The *free person*, whether white or colored, who, seeks to sow in the bosom of our slaves, the seeds of disaffection, and urges them to resist by force, the authority of their legitimate masters, renders himself obnoxious to the penalties of the law. And even he who professing to be prompted by the *pure spirit of christianity*, shall proclaim to our slaves the doctrine of universal emancipation, and denounce slavery as incompatible with the sublime and elevated morality of revelation, and thus scatter broad-cast the seeds of discontent, and estrange the affections of the slave from his master, with the intention of arousing him to the effort to break by force the bonds of servitude, renders himself *a subject* for criminal justice. He whose course is thus characterised, must be supposed *Quixotic indeed*, who, when he had employed the means directly calculated to achieve a result so disastrous, could hope to escape the retribution of justice, by declaring to a jury the purity of his purpose—the integrity of his motive. The intention here, as in every other offence of which it is a constituent, need not be shown by direct and positive proof, where it is inferable from facts and circumstances, in themselves manifest.

It may be further remarked, in reference to the entire statute, that the terms it employs for the pur-

pose of defining the crimes declared, are usually con-
nected by the *disjunctive conjunction, or,* as to "advise,
plot or consult," "for the purpose of encouraging, ex-
citing, aiding or assisting." To *advise,* is one offence,
to *plot* another, to *consult* a third, if *done* for the pur-
pose of *encouraging* or *exciting* or *aiding* or *assisting.*
So that it will be seen that the statute, though it
makes but four descriptions of offence, yet each of
these classes embraces in itself, several crimes of
equal grade.

Having thus determined the proper interpretation
of the statute, let us next inquire whether the evi-
dence warranted the conviction of the prisoner, and
whether the charge of the judge was proper, consid-
ering the indictment, against him. To say nothing
of the indictment embracing in each count, several
distinct offences, inasmuch as the objection was not
taken in the Circuit Court, and has not been discuss-
ed here,—we are pursuaded that the indictment in-
tended to embrace the first class of offences, declared
by the second branch of the act—for advising, plot-
ting or consulting with a slave, &c. for the purpose
of encouraging, exciting, aiding or assisting *any such*
insurrection or rebellion.

The words, " any such," it has been said, refer the
terms insurrection or rebellion, to the first branch of
the act, and are to be taken to mean an actual or
meditated rebellion. What is necessary to make
out these offences, has been already shown,—from
which it will appear, that the evidence did not sus-
tain the indictment; and that the charge of the
judge is erroneous in law. There was no proof of
an actual rebellion, nor none of a meditated rebel-

STATE *vs* M'DONALD.

lion; but every thing of the kind, is directly dispro-
ved, so far as it is possible to shew the non-existence
of a fact.

The witnesses all state that there was no insur-
rection or rebellion, or preparation for it, so far as
they could learn—that they had no knowledge of
the prisoner tampering with any other slave than
Moses. The master of Moses stated that he was
faithful and obedient; and that he gave him the ear-
liest information of the advances of the prisoner.—
From all this it is clear, that Moses never participat-
ed in any criminal design of the prisoner.

The Judge, at the request of the prisoner's counsel,
refused to charge the jury, that unless Moses partici-
pated in the illegal purposes advised by the prisoner,
he could not be found guilty.—But charged the
jury that the purposes of Moses were immaterial, if
the prisoner had the design of encouraging, exciting
and aiding an insurrection or rebellion—although
contemplated by himself alone, and communicated to
Moses with the view of securing his co-operation.

In the refusal to charge, as well as in the charge
given, there is error; for the indictment before us,
charges offences,—to complete which, it is necessary
to shew the participation of slaves, as has been suffi-
ciently shewn in considering the different parts of the
act.

Had the indictment charged an advising, &c., for
the purpose of encouraging, &c., an intended rebel-
lion, &c.—we will not say that the proof would have
been sufficient to authorise a conviction. Such an
expression by this Court, might prejudice the prison-
er, should he be indicted hereafter for that offence;

but we cannot forbear the opinion, that such indict-ment would much better suit the proof than any that could be framed under the statute.

We might here close this opinion, with an annun-ciation of a judgment of reversal, did we not deem it proper to notice a question of very great moment, which was mooted at the bar. It was argued for the prisoner, that as the advising, plotting or consult-ing, for the purpose of encouraging, exciting, aiding or assisting an insurrection or rebellion, against the laws, government or people, was treason in other countries, and particularly in England,—these could not be indicted as a distinct and substantive offence here.

The constitution of the United States, having de-cided that "*Treason* against the United States, shall consist only in levying war against them, *or in* adher-ing to their enemies, giving them aid and comfort," and the constitution of this State, having declared that, "Treason against the State, shall consist only in levying war against it, or in adhering to its ene-mies, giving them aid and comfort"—the statute coming in conflict with these constitutional inhibi-tions, must yield to their paramount influence.

Let it be premised that the provision of the *feder-al* constitution, must have a federal and not a national operation,—that it relates to the United States or a sisterhood of States, and does not limit the powers of any member of the confederacy, considered singly. And even this has never been held to trammel the action of Congress to pass any law which was deem-ed necessary to protect the interests of government, within the range of its delegated powers; though in

doing so, they might denounce as penal, an act which would be treason in other countries. To clip or counterfeit the coin of the realm was treason in England, yet no one doubts the power of Congress to punish the clipping or counterfeiting of the legitimate currency of the United States.

In the case of *exparte Bollman & Swartwourt*,* the right to punish offences which do not constitute *treason*, as limited by the constitution, but which come within the legal definition of that crime, was considered by the Supreme Court of the United States. The Chief Justice remarks, "Crimes so atrocious as those, which have for their object, the subversion by violence of those laws and those institutions, which have been ordained in order to secure the peace and happiness of society, are not to escape punishment because they have not ripened into treason. The wisdom of the legislature is competent to provide for the case; and the framers of our constitution, who not only defined and limited the crime, but with jealous circumspection, attempted to protect their limitation, by providing that no person should be convicted of it, unless on the testimony of two witnesses to the same overt act, or on confession in open Court, must have conceived it more safe that punishment in such cases should be ordained by general laws, formed upon deliberation, under the influence of no resentment, and without knowing on whom they were to operate, than that it should be inflicted under the influence of those passions which the occasion seldom fails to excite, and which a flexible definition of the crime, or a construction which would render it flexible, might bring into operation. It is therefore more

*4 Cranch 126

safe, as well as more consonant to the principles of our constitution, that the crime of treason should not be extended by construction to doubtful cases; and that crimes not clearly within the constitutional definition, should receive such punishment as the legislature in its wisdom may provide."

Chipman, an author of considerable learning, in his Treatise on Government, (p. 259,) says, "Power is given to Congress to punish crimes, as expressed in the constitution. This has always been construed not to exclude the power of punishing in other cases. It results from the nature of government, and is contained in the clause giving to Congress the power to make all laws necessary and proper for carrying the constitution into effect; that Congress have the power to enact penalties in all cases where it may be necessary, for carrying their measures into effect; and to make laws for the punishment of all crimes, which may impede the measures, obstruct the authority of the government, or injuriously affect it in any and all its departments; but Congress have not, unless in places, over which they have exclusive jurisdiction, the power to punish crimes, because they are injurious to society."

Without pretending to declare an acquiescence in all the reasoning of this learned author, we think he very well maintains that the provision of the Constitution we are considering, does not restrain Congress in the exercise of its *expressly* delegated powers, or of those powers which are necessary to carry these into effect.*

* Vide further, Searg. Con. Law, 352, 382.

If this provision of the Federal Constitution does not limit the powers of Congress'—a proposition we

take to be unquestionable,—certainly our own Constitution, in the employment of similar terms, cannot operate to restrain the action of our Legislature.— The Congress of the United States possesses only such powers as are delegated, or such as are necessary to give effect to those that are delegated. Our Legislature looks not to the Constitution for a grant of powers, but exercises all such as are compatible with the social compact, unless restrained by express inhibition or clear implication.

Again : The right of protection belongs to man in a state of nature—and he may exert this right, as a member of society, in cases of emergency, where there is neither time nor opportunity to apply to the government. This right of protection extends itself to communities, and is the foundation of the moral power to punish crimes, or provide against their commission. Society owes to each of its members a security for those rights, which he retains upon entering into it : among these stands first, the right of personal security. If this right is assailed, the assailant is obnoxious to punishment. And the right to punish crime, actually committed, includes the right to prevent it, by punishing him who contemplates it, without waiting for an act of personal aggression. This is preventive justice—the right to exercise which, is unquestionable, at this day.

We do not deem it necessary to enquire, if an actual rebellion or insurrection had taken place, whether the indictment should have been for *treason ;* or whether *treason* can be committed against the laws, government or people of a State—as neither of these

4P 59

questions arise in this case : " Sufficient unto the day, is the evil thereof."

Several questions are referred, for our decision, which we have not expressly noticed.—Such as can arise, should there be another trial, will be found, however, to be embraced by those we have considered.

Our conclusion is, that the conviction of the prisoner was unauthorised—that the judgment of the Circuit Court must be reversed, and that the prisoner remain in custody, until he be discharged by due course of law.